

DA 11-0155

IN THE SUPREME COURT OF THE STATE OF MONTANA

2012 MT 85N

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

PAUL BURGAD,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Seventh Judicial District,
In and For the County of Prairie, Cause No. DC 09-08
Honorable Richard A. Simonton, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Joslyn Hunt, Chief Appellate Defender, Koan Mercer, Assistant Appellate
Defender, Corey Rundquist, Law Student, John Wright, Law Student,
Helena, Montana

      For Appellee:

          Steve Bullock, Montana Attorney General, Mardell Ployhar, Assistant
Attorney General, Helena, Montana

          Garry Bunke, Prairie County Attorney, Terry, Montana

Submitted on Briefs:  March 28, 2012

Decided:  April 17, 2012

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(d), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 The District Court for the Seventh Judicial District, Prairie County, sentenced Paul Burgad to five years with the Department of Corrections upon his plea of guilty to one count of felony possession of dangerous drugs. The court also sentenced Burgad to six months in the Dawson County correctional facility upon his plea of guilty to one count of misdemeanor possession of dangerous drugs. The court ordered that the sentences run concurrently and that both sentences be suspended upon various conditions. Burgad now appeals the court's Judgment and Sentencing Order.

¶3 Burgad raises three issues on appeal:

¶4 1. Did the District Court err when it failed to look beyond the existence of a conclusory police communication and failed to evaluate what objective data and articulable facts officers actually possessed?

¶5 2. Were several of the District Court's findings regarding Burgad's observed conduct clearly erroneous?

¶6 3. Did the State fail to produce objective data and articulable facts that in their totality created a particularized suspicion of criminal activity?

**Factual and Procedural Background**

2

¶7    On the afternoon of February 21, 2009, Montana Highway Patrol Trooper Glen Quinnell stopped Burgad for speeding on Interstate 94 near Glendive, Montana. When Trooper Quinnell asked Burgad where he was headed, Burgad, who was from Bismarck, North Dakota, replied that he was traveling to Portland, Oregon, to visit some friends.

¶8    Trooper Quinnell later testified that when he first stopped Burgad, Burgad seemed unusually nervous. Trooper Quinnell claimed that Burgad's lips were quivering, his hands were shaking, and his pulse was visible in his neck. In addition, Trooper Quinnell testified that there was an overwhelming odor of air freshener coming from inside the vehicle.

¶9    Trooper Quinnell also testified that he believed Burgad's story was inconsistent because Burgad initially said that he was on vacation and that he was headed to Portland to visit friends for a week. However, Trooper Quinnell noticed that in the back seat of the vehicle, Burgad had only a small suitcase that did not seem consistent with a week-long trip. When Trooper Quinnell asked Burgad where he worked, Burgad said he worked for a beer distributor, but, at some point during their conversation, Burgad stated that he was not actually on vacation, he had been laid off. While Trooper Quinnell was suspicious of Burgad, he did not believe that he had sufficient particularized suspicion to justify holding Burgad any longer. Thus, Trooper Quinnell issued Burgad a warning for speeding and allowed him to continue on his way.

¶10    After the traffic stop, Trooper Quinnell asked dispatch to run a criminal history on Burgad. The criminal history showed that Burgad had been convicted of drug offenses in the past, and that the Drug Enforcement Administration (DEA) had an ongoing

3

investigation into Burgad's activities. Based on that information, Trooper Quinnell contacted Detective Paul Olson with the narcotics unit in Bismarck.

¶11     Although he had heard of Burgad, Detective Olson did not have any direct knowledge of Burgad's background. When Detective Olson spoke with his partner, he learned that Burgad was a known drug dealer in the Bismarck area and that he was known to use heroin and prescription pills. Detective Olson's partner also told him that the narcotics unit had attempted to set up a controlled buy from Burgad using a confidential informant, but the deal did not go through. Detective Olson relayed this information to Trooper Quinnell. He also informed Trooper Quinnell that Burgad would likely have a large amount of cash on him to use to purchase narcotics in Oregon.

¶12     As a result of this information, Trooper Quinnell contacted Prairie County Deputy Sheriff Gregory Huber, and asked Deputy Huber to watch for Burgad's vehicle as it neared Terry, Montana, and to stop Burgad if he saw Burgad commit a violation. About thirty miles down the road from where Trooper Quinnell had pulled Burgad over, Deputy Huber pulled Burgad over for speeding. While Deputy Huber was talking to Burgad, Trooper Quinnell arrived on the scene.

¶13     Believing that he now had sufficient particularized suspicion to conduct a further investigation of Burgad, Trooper Quinnell called for a canine unit to conduct a canine sniff of Burgad's vehicle. Undersheriff Mike Johnson arrived with his dog within fifteen minutes of Trooper Quinnell's request. The dog sniffed Burgad's vehicle and alerted to the trunk.

¶14   Based on the canine sniff, Trooper Quinnell informed Burgad that he was going to seize the vehicle and apply for a warrant to search it. Trooper Quinnell asked Burgad if there was anything in the trunk that he should know about. Burgad informed him that the trunk contained $5,000 in cash, a marijuana cigarette, and some used syringes that might have drug residue on them. Burgad claimed that he had the cash because he is a professional poker player.

¶15   When the trunk of Burgad's vehicle was searched some time later pursuant to a search warrant, the officer conducting the search discovered a marijuana cigarette, $5,000 in cash, and drug paraphernalia including a digital scale and numerous syringes and Ziploc bags containing drug residue. Burgad was charged with two counts of felony possession of dangerous drugs in violation of § 45-9-102(6), MCA; one count of misdemeanor possession of dangerous drugs in violation of § 45-9-102(2), MCA; and one count of misdemeanor possession of drug paraphernalia in violation of § 45-10-103, MCA.

¶16   Burgad filed a motion to dismiss and to suppress evidence arguing that Trooper Quinnell lacked particularized suspicion to stop Burgad or to search his vehicle. In that same motion, Burgad argued that Trooper Quinnell failed to read Burgad his *Miranda* rights prior to questioning him. The District Court denied Burgad's motion after a hearing.

¶17   Burgad entered into a plea agreement with the State wherein he agreed to plead guilty to one count of felony possession of dangerous drugs and one count of misdemeanor possession of dangerous drugs while reserving his right to appeal his

motion to dismiss and to suppress. The District Court sentenced Burgad to five years with the Department of Corrections for the charge of felony possession of dangerous drugs, and six months in the Dawson County correctional facility for the charge of misdemeanor possession of dangerous drugs. The court ordered that the sentences run concurrently and that both sentences be suspended upon various conditions. Burgad now appeals the court's Judgment and Sentencing Order.

**Discussion**

¶18 We have determined to decide this case pursuant to Section I, Paragraph 3(d) of our Internal Operating Rules, which provides for noncitable memorandum opinions.

¶19 We review a district court's denial of a motion to suppress evidence to determine whether the court's findings of fact are clearly erroneous, and whether the court correctly applied those findings as a matter of law. *State v. Kaufman*, 2002 MT 294, ¶ 9, 313 Mont. 1, 59 P.3d 1166. We defer to the district courts on matters of fact-finding, and we will not disturb a trial court's findings of fact unless they are clearly erroneous. *Kaufman*, ¶ 12. In addition, we apply the legal standard of objective reasonableness in our particularized suspicion analysis to determine whether the inferences drawn from the objective facts give rise to a particularized suspicion of wrongdoing. *Kaufman*, ¶ 11. We review this application of legal standards to factual findings de novo. *Kaufman*, ¶ 12. This bifurcated standard of review "affords appropriate deference to the trial court's fact-finding role and responsibility, while providing this Court with the opportunity to review legal conclusions and the application of legal standards de novo." *Kaufman*, ¶ 12 (emphasis omitted).

¶20    We conclude in this case that the District Court's findings of fact are supported by substantial evidence and the legal issues are controlled by settled Montana law, which the District Court correctly interpreted.    Accordingly, based on the totality of the circumstances in this case, we hold that the District Court correctly determined that Trooper Quinnell had a particularized suspicion of wrongdoing.

¶21    Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ MIKE McGRATH
/S/ BRIAN MORRIS
/S/ JIM RICE
/S/ BETH BAKER